## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

BENJAMIN A. POST,  :
    Plaintiff  :
      :  CIVIL ACTION
    v.  :
      :  NO. 06-CV-4587
ST. PAUL TRAVELERS INSURANCE  :
CO.,  :
    Defendant

**June _15__, 2010**                                                   **Anita B. Brody, J.**
### MEMORANDUM

## I. BACKGROUND

In 2003, Plaintiff Benjamin Post ("Post" or "Ben"), and Tara Reid ("Reid"), were defense

counsel representing Mercy Hospital ("Mercy") and other affiliated defendants in a medical

malpractice case captioned *Bobbett, et. al. v. Mercy Hospital, et. al.* (the "Bobbett case"). Due to

unanticipated events, Mercy settled the case with the Bobbetts in the middle of trial. Soon

thereafter, Mercy informed Post of its intention to file a legal malpractice action against him. In

addition, the Bobbetts' lawyer, Joseph Quinn ("Quinn") commenced a Petition for Sanctions

("Sanctions Petition" or "Petition") against Post, Reid and their affiliated law firms. St. Paul

Travelers Insurance Company ("St. Paul"), Post and Reid's legal malpractice insurance provider,

refused to provide coverage to Post or Reid with regards to the Sanctions Petition.

On February 7, 2008, Post filed an amended complaint against St. Paul, alleging Breach of Contract in regards to an insurance policy (Count I), Breach of Contract on an agreement to pay the costs of the sanctions proceeding (Count II), Bad Faith (Count III), Promissory Estoppel (Count IV), and asking for a Declaratory Judgment (Count V). St. Paul filed a Motion for Partial Summary Judgment on all counts except for Promissory Estoppel. Post filed a Motion for Partial Summary Judgment on both Breach of Contract claims, and on the Declaratory Judgment Count. On January 7, 2009, I granted Post's Motion for Summary Judgment on the Breach of Contract of the insurance policy, and with respect to Declaratory Judgment. I denied St. Paul's Motion for Partial Summary Judgment.[1]

On January 7, 2009, I concluded that St. Paul had a duty under a liability policy it held with Post & Schell, the law firm where Post was a partner during the relevant time period, to defend Post in the Sanctions Petition brought against him, and that St. Paul's refusal to defend Post in these proceedings constituted a breach of contract. I held that Post was entitled to reimbursement for attorneys' fees and costs expended by him in defense of the Sanctions Petition, but left open the amount of reimbursement due to Post. Therefore, the only issue remaining in this case is the amount of damages due to Post under Count I. On October 20, 2009, I held an evidentiary hearing to resolve this issue.

---

[1] On February 9, 2009, St. Paul filed a renewed Motion for Summary Judgment on the Bad Faith claim. In an opinion dated March 31, 2009, I granted St. Paul's Summary Judgment Motion on the Bad Faith claim, and on May 22, 2009 I denied Post's Motion for Reconsideration. On May 22, 2009, I granted Post's Motion to Withdraw Counts II and IV of the amended complaint (Breach of Contract on an agreement to pay the costs of the sanctions proceeding and Promissory Estoppel).

## II.  JURISDICTION

This court has jurisdiction to hear this case under 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.  Both parties agree that Pennsylvania law applies to this case.

## III.  FINDINGS OF FACT

1.     Post is a Philadelphia-based medical malpractice defense attorney.  (T.T. 1, 30.)[2]

2.     Post was a partner at Post & Schell from 1990 until the spring of 2005.  He formed Post & Post LLC in May 2005.  (T.T. 1, 30-33.)

3.     Post was insured by a Professional Liability Policy ("Liability Policy" or "Policy") issued to Post & Schell by St. Paul, effective in 2005.  (T.T. 1, 32; Ex. 1; Doc. #86, p. 6.)[3]

4.     The Policy included a duty to defend "any protected person against a claim or suit for loss covered by this agreement."  A "claim" is defined as a "demand that seeks damages." (Ex. 1; Doc. #86, p. 4.)

5.     The Policy states that a claim is considered to have been first made or brought against a protected person on the date that St. Paul or any protected person "first receives written

---

[2] "T.T" denotes "Trial Transcript," followed by the day of trial, and the page reference. The following dates correspond to each day of trial:

T.T. 1 - 10/20/09
T.T. 2 - 10/21/09
T.T. 3 - 10/22/09
T.T. 4 - 1/5/10
T.T. 5 - 1/6/10

[3] "Ex." denotes Exhibits admitted at trial. "Doc. #86 " denotes the January 7, 2009 Explanation and Order from this Court.

notice of such a claim" or when St. Paul received written notice from a protected person "of a specific wrongful act that caused the loss which resulted in such claim or suit." (Ex. 1; Doc. #86, p. 4.)

6. In 2003, while Post was a partner at Post & Schell, he, Tara Reid and Post & Schell were retained to represent defendants Mercy Hospital-Wilkes Barre ("Mercy Hospital"), Mercy Healthcare Partners ("MHP") and Catholic Healthcare Partners ("CHP") (collectively, "Mercy"), in a medical malpractice case captioned *Bobbett, et. al. v. Mercy Hospital, et. al.* ("*Bobbett*"). The case was brought in the Court of Common Pleas in Luzerne County by the parents of deceased Torajee Bobbett against the Mercy defendants and other health care providers. The case was assigned to the Honorable Peter Paul Olszewski. (Doc. #86, p. 2; T.T. 1, 33-36.)

7. *Bobbett* went to trial in Luzerne County in September 2005. (T.T. 1, 37-38.)

8. On Friday, September 23, during trial, Mercy risk manager Anne Marie Zimmerman testified on cross-examination that defense counsel for Mercy (i.e. Post and Reid) had intentionally concealed certain metadata in Mercy policies. (T.T. 1, 41-43.) Post vigorously denies that he or other counsel for Mercy ever intentionally concealed information that the Bobbett plaintiffs requested in document discovery. (T.T. 1, 43.)

9. Almost immediately thereafter, Mercy and the Bobbett plaintiffs reached a settlement agreement in the amount of $11 million. Post was absent during the settlement discussions. (T.T. 1, 46.) Plaintiffs' lawyer Joseph Quinn announced the settlement on September 27, 2005. Mercy claimed the settlement was due, at least in part, to allegations of discovery abuse by defense counsel. Soon thereafter, Mercy effectively

discharged Post as its counsel. (Doc. #86, p. 2; Ex. 6; T.T. 1, 47.) Post, at the time, represented Mercy in approximately 10-12 cases. All cases were transferred from Post to other attorneys. (T.T. 1, 47.)

10. On Sunday, September 25, 2005, James Saxton ("Saxton"), counsel for Mercy, advised Barton Post, Plaintiff Ben Post's father, that Mercy was going to bring a lawsuit for legal malpractice against Ben, and that the claim should be reported to Ben Post's insurance carrier. Saxton also asked for the name of Ben's carrier so that he could make the report. (T.T. 4, 167-68.)

11. On September 27, 2005, Post learned of a carve-out in the settlement between Mercy and the Bobbetts. This carve-out was for third-party claims; Mercy believed this carve-out allowed them to sue Post. (T.T. 1, 47-48; Ex. 6.)

12. On October 6, 2005, Catholic Health Partners Vice-President for Risk and Insurance Michael Williams ("Williams") sent a letter to Post. This letter was a "follow-up . . . regarding termination of the attorney client relationship" between Post's firm and Mercy. The letter requested that Post send any documentation related to the *Bobbett* case to Mercy, cease destruction of any documentation and preserve all electronically stored information. The letter noted that Mercy would be reviewing this information as part of an investigation into the manner in which the *Bobbett* case was handled. (Ex. 3, T.T. 1, 49-50.)

13. On October 12, 2005, Williams sent a follow-up letter to Post. The letter made clear that Ms. Zimmerman's testimony and the allegations of misconduct by Post were what drove Mercy to settle the case. (Ex. 4.)

14. On October 20, 2005, Williams sent a third letter to Post. This letter noted a carve-out for third-party claims in the Mercy-Bobbett settlement and release, and suggested that Post notify his professional liability insurer of this carve-out, and ask a representative to contact Williams. (Ex. 6.)

15. On or about October 18, 2005, Post retained attorney George Bochetto ("Bochetto") of Bochetto & Lentz, P.C. (T.T. 1, 52.)

16. Post felt that he needed to hire an aggressive lawyer who would not be intimidated by the set of circumstances he was facing in the Luzerne County courthouse, including a Plaintiff's lawyer (Quinn) whom he considered to be highly aggressive, and a Judge whom he believed was hostile to him. Post was also concerned about jury pool contamination due to the intense media coverage of the events both on newspapers and the Internet. (T.T. 1, 84, 102, 118.)

17. On October 27, 2005, Post & Schell provided written notice to Defendant St. Paul of the allegations of legal malpractice asserted against Post and the firm and the possible professional liability claim. (Ex. 8; T.T. 1, 74.)

18. On November 3, 2005, Bochetto sent a letter to St. Paul to put them on notice of Mercy's potential claim against Post. Bochetto's letter requested that St. Paul "confirm coverage" and arrange for payment of defense of Post. (Ex. 9; T.T. 2, 10.)

19. On or about November 18, 2005, Mercy, through its counsel Saxton, wrote to Bochetto, inviting a meeting of "all stakeholders," including St. Paul and Post & Schell, in order to determine whether Mercy's claim might be settled before it filed suit. (Ex. 10; T.T. 77.)

20. On November 21, 2005, Quinn, on behalf of the Bobbetts, filed a 108-page Petition for Sanctions, against Post and Reid (as well as Barton Post and Post & Post), alleging that they illegally concealed information from the Bobbetts during discovery. In addition to alleging intentional misconduct, the Sanctions Petition alleged that Post engaged in negligent malfeasance. In the prayer for relief, the Bobbetts sought sanctions as well as "any other prayer for relief this Court deems just and equitable under the unique and serious circumstances presented before it." (Ex. 12, *see* p. 109.)

21. On November 28, 2005, Bochetto wrote a letter to St. Paul advising it of the Sanctions Petition. The letter referenced the prior malpractice claim made by Mercy and stated that this new claim was a "follow-up" to the prior one. The letter requested confirmation that St. Paul would reimburse defense fees and costs. (Ex. 13.)

22. Mark Anesh ("Anesh"), a lawyer in the New York office of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP acted as coverage counsel on behalf of St. Paul in dealing with Bochetto and Post.

23. In a December 8, 2005 letter, Anesh denied coverage for defense or indemnity against the Sanctions Petition. (Ex. 14.)

24. In the December 8 letter, Anesh informed Bochetto that St. Paul received a draft of the Sanctions Petition on October 31, 2005. (Ex. 14.) Post first became aware of the Petition when it was filed on November 21, 2005.

25. Once St. Paul made a decision to deny coverage, it asked Anesh for his agreement or disagreement with this position, and asked Anesh to be the scrivener of the December 8 letter. St. Paul failed to inform Anesh of Bochetto's November 3 letter advising St. Paul

of Mercy's legal malpractice claim against Post. St. Paul also failed to inform Anesh of the October letters from Williams to Post advising Post of Mercy's impending malpractice claim. (T.T. 2, 166-68, 172-73.)

*Mercy's involvement in the Sanctions Petition*

26.    Two counsel for Mercy participated in an initial conference call regarding the Sanctions Petition with Judge Olszewski. (T.T. 2, 21.)

27.    Early on in the proceedings, Mercy insisted on receiving copies of all discovery produced by Post in connection with the Sanctions Petition. (T.T. 2, 21-22.)

28.    Bochetto received telephone calls from Mercy's counsel in late November and early December asking him how he planned to respond to Joseph Quinn on particular aspects of the proceedings, before he heard from Quinn regarding the particular issues or questions. Bochetto believed that Mercy's counsel knew in advance the actions Quinn planned to take in the proceedings. (T.T. 2, 22-23.)

29.    On or about January 17, 2006, Judge Olszewski held a conference call regarding depositions in the sanctions proceedings. (T.T. 2, 23.)

30.    Following the conference call, Mercy formally participated in depositions related to the Sanctions Petition, by appearing at the table, entering an appearance and asking questions. When Mercy's counsel first attempted to depose Post, Bochetto objected that Mercy was not permitted to do so. Mercy countered that Judge Olszewski had given them permission to participate in the depositions during the January 17th conference call, and made such a representation on the record at the depositions. (T.T. 2, 23-24.)

31. On January 23, 2006, Post filed a motion for sanctions against Mercy for discovery violations in the sanctions proceedings. Mercy responded on January 25, 2006. (Exs. 17, 18; T.T. 1, 96-97.)

32. On February 8, 2006, Mercy filed its "Answer" to the Sanctions Petition. This pleading affirmatively alleged that Post had withheld discovery from the Bobbetts, and prayed for affirmative relief against Ben Post and Post & Post, including sanctions and "any other relief, this Court deems just and equitable." (Ex. 22.)

*The Motion to Enforce the Settlement Agreement and Related Appellate Proceedings*

33. Post believed that the settlement agreement between Mercy and the Bobbetts precluded Mercy from making a claim against him. On January 27, 2006, Post filed a motion to enforce the settlement agreement and release entered into in the *Bobbett* case. The purpose of this motion was to prevent Mercy from furthering its malpractice claim through the vehicle of the sanctions proceedings. (Ex. 20; T.T. 2, 35-42.)

34. Mercy and Quinn, on behalf of the Bobbetts, fought this motion to enforce the settlement agreement. (Exs. 23, 24.)

35. On April 12, 2006, Judge Olszewski entered an Order denying Post's motion to enforce the settlement agreement. Judge Olszewski's memorandum recognized the link between the sanctions proceedings and the Mercy malpractice claim, and the potential consequences to Post stemming from the proceedings. He wrote:

> What sanctions, if any, should be imposed are best determined by the Disciplinary Board and in the context of the impending legal malpractice action. Given the potentially devastating consequences to Counsel in this matter, we are of the firm opinion that those venues are simply better suited to consider the alleged underlying conduct. It is also obvious that the allegations regarding Counsels'

misconduct raised and reported during the trial have had a profound effect on them.

(Ex. 33.)

36. Judge Olszewski also explicitly recognized his uncertainty regarding the denial of Post's motion:

> Turning to Defendant's Motion to Enforce the Settlement Agreement we make the following observations. After considerable thought, we have concluded, albeit with substantial hesitation and equivocation, that Plaintiffs' technical position is correct. We will, therefore, deny Defendants' request. However, we do so absent a firm conviction that this conclusion is correct.

(Ex. 33.)

37. On April 20, 2006, Bochetto filed a motion to amend the Order to allow an interlocutory appeal, and to stay all proceedings in the interim, which Judge Olszewski immediately granted. (Exs. 34, 35.) Post proceeded to appeal the decision through the Pennsylvania state courts. (Exs. 38, 39, 44, 45, 46, 59 and 60.) The Superior Court denied Post's Petition for Permission to Appeal and his petition for reargument *en banc*. (Exs. 45, 46.) Post then filed a "King's Bench" Petition with the Supreme Court of Pennsylvania. (Ex. 55.) Mercy and Quinn opposed this petition. (Exs. 59, 60.)

*The Anesh letter*

38. By the spring of 2006, Post had expended over $400,000 in legal fees. Bochetto continued to ask St. Paul to indemnify Post. In March and April 2006, Bochetto, Anesh and other involved parties met to discuss reimbursement.

39. On May 3, 2006, Anesh wrote a letter to Bochetto, Gary Figore, counsel to Tara Reid ("Figore"), and Jeffrey Weil, counsel to Post & Schell ("Weil") (the "Anesh letter").

Tara Reid had been Post's co-counsel in the underlying *Bobbett* litigation, was under threat of a malpractice lawsuit, and was likewise named in the Sanctions Petition along with Post. This letter proposed that St. Paul reimburse the parties for certain expenditures relating to the ongoing proceedings. The letter specified rates of compensation of $225 per hour for partners and $150-175 per hour for associates. (Ex. 36.)

40. The letter was signed by Mark Anesh and included three other signature lines, one each for Bochetto, Figore and Weil. Bochetto signed the letter; however, neither Figore nor Weil ever signed it. (Ex. 36.)

41. Post authorized Bochetto to sign the Anesh Letter on the condition that it would be binding only if the others also signed it; Post understood that the agreement was one which required everyone's signature to be effective. (T.T. 5, 37-39.) In particular, Post was concerned that Ms. Reid, whom he had worked closely with for many years and who had left Post & Schell to joint Ben at Post & Post, might sue him for reimbursement of her malpractice expenses. A potential lawsuit from Ms. Reid, a colleague and young lawyer, would have been hurtful to Post's new law firm and career generally. For Post, Reid's signature to the terms of the letter, which would result in reimbursement to her by St. Paul, was an important component of the overall agreement. (T.T. 5, 37-39.)

42. Bochetto also understood, based on the meetings between the parties, that the letter would only take effect if all of the parties signed it. (T.T. 2, 71; T.T. 4, 106-107.) Bochetto testified, "[I]t was obvious both from the context and from the spoken word at the meetings that all three people, me, Gary Figore on behalf of Tara Reid, and Jeffrey Weil

on behalf of Post & Schell, all three of us had to agree to that document or it wasn't going to take effect."  (T.T. 4, 106-107.)

43.    Figore also understood that the proposal was contingent on all of the parties agreeing to it.  (T.T. 3, 15.)  Figore testified, "My understanding was that Mr. Anesh was going to submit his proposal in writing and then it was contingent upon all of us agreeing to do it." (Id.)

*Post v. Quinn*

44.    In September 2006, Post sued Joseph Quinn and an Internet Service Provider (ISP) that was publishing an account of the *Bobbett* case, alleging defamation and tortious interference.  The suit was designed to disprove, as defamatory, the allegations of misconduct that Mercy was relying upon in its claims against Post.  Post also believed that the suit might be one additional factor that would persuade Quinn and the Bobbetts to dismiss the Sanctions Petition.  (T.T. 1, 117-19.)

45.    The *Post v. Quinn* complaint was filed in the Court of Common Pleas of Philadelphia County.  Post filed suit in Philadelphia rather than Luzerne, because he believed that he could not get a fair hearing in Luzerne County.  (Ex. 53; T.T. 1, 52, 84, 101-102.)

46.    On October 30, 2006, attorney Charles Fax ("Fax"), on behalf of Post, filed an amended complaint in *Post v. Quinn*, in response to preliminary objections filed by the defendants. (Exs. 61, 62.)

47.    Between March 13, 2007 and March 23, 2007, the defamation suit, the Sanctions Petition and Post's petition for extraordinary relief from the Supreme Court were all discontinued

with prejudice.  (Exs. 70, 71, 72.)  In addition, the ISPs and Quinn agreed to remove the

allegedly defamatory statements about Post from their websites.  (T.T. 1, 123-24.)

*Continuation of proceedings and suit against St. Paul*

48.     On October 13, 2006, Post filed suit against St. Paul, seeking coverage and other relief.

49.     In March 2007, Mercy was still threatening to sue Post for malpractice, and counsel for

        Mercy was proposing mediation.  On March 28, 2007, Bochetto again wrote a letter to St.

        Paul informing them that the Mercy malpractice claim continued and demanded again

        that it cover attorneys fees.  (Ex. 73.)

50.     Post agreed to mediate Mercy's claim, but demanded that St. Paul assume the legal fees

        and costs for this process.  (T.T. 2, 55.)

51.     St. Paul asserted that it had no duty to represent Post in the mediation.  St. Paul offered to

        pay $3,000 toward Post's legal fees.  (Ex. 78; T.T. 2, 55-56.)

52.     On August 6, 2007, Bochetto rejected this offer, describing it as an absurdity in light of

        the degree of effort required.  (Ex. 79; T.T. 2, 55-56.)

53.     On September 6, 2007, before the scheduled mediation, Mercy sent to Bochetto its 58-

        page draft complaint against Post for legal malpractice and breach of contract.  (Ex. 81.)

54.     On September 14, 2007, Post submitted a mediation statement to the mediator judge.

        (Ex. 82.)

55.     The mediation was unsuccessful.  (T.T. 1, 106-107.)

56.     On November 19, 2007, Mercy commenced its legal malpractice action against Post by

        filing a praecipe for a writ of summons in Luzerne County against Post & Post, Post &

        Schell, Ben Post, and Tara Reid.  (Ex. 85.)

13

*Post v. Mercy*

57.  On September 14, 2007, Bochetto sent a draft complaint of *Post v. Mercy* to Mercy's counsel. The draft complaint, never filed, alleged wrongful use of civil proceedings, breach of contract, fraud and misrepresentation, and civil conspiracy. (Ex. 83.)

58.  The first version of the complaint was drafted in preparation for the mediation between Post and Mercy. The mediation was an attempt to prevent Mercy from filing a formal legal malpractice claim against Post. Although Post was contemplating filing the complaint in Philadelphia County, Bochetto inserted a Luzerne County caption in the draft to Mercy, so as not to tip off opposing counsel that venue in Luzerne might be questioned and that Post was contemplating a forum less unfavorable to him. (Ex. 83; T.T. 2, 51.)

59.  As stated above, the mediation was unsuccessful and Mercy filed its legal malpractice claim in November 2007. (Findings of Fact ¶¶ 55-56.)

60.  In January 2008, Fax completed a re-draft of the *Post v. Mercy* complaint. This complaint contained many of the same allegations, but also contained several revisions. (Ex. 87.)

61.   On February 6, 2008, Post filed a praecipe for writ of summons against Mercy in Philadelphia County. This suit, *Post v. Mercy*, sought affirmative relief for Mercy's misconduct towards Post. The claim was premised on Mercy's breach of representations and promises to Post and its abuse of process in joining forces with Quinn against Post. Post's lawyers filed suit against Mercy in Philadelphia rather than awaiting suit against

Post in Luzerne County, because of the concern that Post would not get a fair hearing in Luzerne.  (Ex. 88; T.T. 1, 52, 84, 101-102; T.T. 2, 49.)

62.    In November 2008, the parties reached a final agreement for discontinuance, with prejudice, of *Mercy v. Post* and *Post v. Mercy*.  On November 12, 2008, a Praecipe for Discontinuance with prejudice was filed in *Mercy v. Post*, pending in Luzerne County. The following day, a Praecipe to Discontinue Action with prejudice was filed in *Post v. Mercy*, pending in Philadelphia County.  (Exs. 91, 92.)

## IV.  DISCUSSION

This court previously granted summary judgment to Post against St. Paul on Count I of his Amended Complaint, for Breach of Contract regarding the Insurance Policy, and on Count V of the Amended Complaint, for declaratory judgment that St. Paul was required to defend Post in the Sanctions Petition and that Post is entitled to reimbursement for the same.  *See* Doc. 86.  I held a trial on October 20th, 21st and 22nd of 2009, and on January 5th and 6th of 2010, to consider the amount of fees and expenses that Post is entitled to recoup from St. Paul in accordance with my previous opinion.[4]

## 1. The "Anesh letter"

The threshold legal question is whether the "Anesh letter" of May 3, 2006 constitutes a binding contract between the parties.  This letter, sent by Anesh to Bochetto, Figore and Weil proposed reimbursement to the parties for certain expenditures relating to the proceedings.  If the

---

[4] This court also granted summary judgment to St. Paul on Count III of Post's Amended Complaint, for bad faith refusal to provide insurance coverage. *See* Doc. 109, 3/31/09, p. 6.  Post has reserved his right to appeal the order of summary judgment when final judgment has been entered in this case.

letter does bind the parties, then its provisions would dictate in many respects the specific fees for which St. Paul must reimburse Post. I conclude that the letter does not constitute a binding contract. Therefore, none of its provisions bind my determination regarding the fees due to Post.

The letter from Anesh to the parties who sought indemnification from St. Paul contains three signature lines, one each for representatives of Post, Reid and Post & Schell. The only person who ever signed the letter was Bochetto, Post's representative. Under Pennsylvania law, the primary question under this set of facts is whether the parties intended that a contract would not exist unless all of the signature lines were filled. *See Shovel Transfer & Storage Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 137-38 (Pa. 1999).

*Shovel* involved a disagreement between two parties, Shovel Transfer and Storage ("Shovel") and the Pennsylvania Liquor Control Board ("PLCB"). Shovel operated a distribution facility and had an existing contract with the PLCB to warehouse and distribute alcoholic beverages in its Youngwood, Pennsylvania facility. *Id.* at 134. In 1985-86, the PLCB informed Shovel of its intent to transfer the relevant distribution district to Pittsburgh. *Id.* at 135. Shovel was to evaluate whether relocation to Pittsburgh would be economically feasible for it. In 1986, Shovel began a search for a new facility in Pittsburgh. They located such a facility and signed an agreement to purchase it in May of 1986. The sales agreement contained a contingency clause, which allowed Shovel to withdraw from the agreement in the event that a contract with the PLCB was not negotiated. *Id.* That June, the PLCB toured the facility, and on September 3, the PLCB formally approved of negotiating the storage and distribution contract with Shovel. On October 1, the PLCB sent a "Rough Draft" of the proposed contract to Shovel. Shovel returned the draft without changes. On October 31, the PLCB sent Shovel an unsigned

copy of the contract, which Mr. Shovel was to sign and return to the PLCB.  On November 10, Shovel signed and returned the contract to the PLCB.  The contract had several signature lines for PLCB representatives.  The PLCB Chairman and Attorney General signed the contract.  The Secretary of the Budget and the PLCB Comptroller did not sign the contract.  On November 20, Shovel executed a final sales agreement for the purchase of the warehouse.  In December, the PLCB sent out a Request for Proposal, opening up the project for bidding.  Shovel then sued the PLCB for breach of contract.  *Id.*

The *Shovel* court held that a valid contract was formed between the PLCB and Shovel, and that the PLCB breached this contract.[5]  *Id.* at 134.  The court stated that "a contract is created where there is mutual assent to the terms . . . by the parties with the capacity to contract."  *Id.* at 136.  Further, "[i]f the parties agree upon essential terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date."  *Id.* (internal quotation marks omitted).  Moreover, "[a]s a general rule, signatures are not required unless such signing is expressly required by law *or by the intent of the parties*."  *Id.* at 136 (emphasis added).  Where the signatures are not required by statute, the inquiry turns to whether they were required because the "parties intended that a contract would not exist until all of the signatures were affixed."  *Id.* at 137.   In addition, "the mere presence of signature lines does not determine whether the parties intended to be bound only upon the execution of the document by all signatories."  *Id.* at 138.  The *Shovel* court believed that the parties had agreed orally to the full terms of the contract, even before it was signed, and concluded that "the

_____

[5]  The court also held that the existence of unfulfilled conditions excused the PLCB's duty to perform the contract.  *Id.* at 134.

evidence supports a finding that the parties intended to be bound under the terms of the contract regardless of the execution of all signatories." *Id.* The court considered the parties' conduct both prior to and following the signature of the parties as evidence of their intention to be bound.

In this case, we turn directly to the intent of the parties, because there is no argument that all signatures were required by statute. If the parties intended that a contract would not exist until all signature lines were filled, then no contract was formed. *Id.* at 137. *See also Stephens v. Carrara*, 401 A.2d 821, 824 (Pa. Super. Ct. 1979) ("[W]here the written agreement contains the names of certain persons as parties, and one or more do not sign while others do, the question of whether those who sign are bound is to be determined by the intention and understanding of the parties at the time of the execution of the agreement.").

As a general matter, the intent of the parties to a written contract is contained in the contract itself. *See Shovel*, 739 A.2d at 138. However, a court may look to other aspects of the contract to glean the intent of the parties, and should review the outside record, including a consideration of the parties' conduct in and around the time the agreement was discussed, to determine the parties' intent. *See id.* at 138-39. In addition, any ambiguities regarding the intent of the parties are to be construed against the contract drafter. *Id.* at 139.

The Anesh letter lacks any express term that requires the signatures of all of the parties to make the contract binding. However, this is not determinative. Further, the lack of an express term is less conclusive of the parties' intent in this case than in the *Shovel* case. In *Shovel*, the PLCB was the party claiming that all signature lines had to be filled before the contract was binding; it was also the PLCB who had drafted the contract. Ambiguities are construed against the contract drafter. The court in *Shovel* stated that if the PLCB had really intended for the

18

agreement to be binding only upon the signature of all signatories, the PLCB could have included such an express term in the contract. *Id.* at 139. The same argument does not apply here; since Post did not draft the letter, he did not have the same opportunity, or responsibility, to ensure that such an express term was included.

In addition to looking at the express terms of the contract, a court should look at other evidence of the parties' intent, both in and outside of the contract. A court can look at outside evidence to determine the intent of the parties at the time the agreement was being discussed, passed around, and signed by the parties. In this case, Bochetto, Post and Figore all testified that they believed that the letter was not binding unless all of the parties signed it. (*See* Findings of Fact ¶¶ 41-43). Post testified that he believed the agreement was binding only upon the signature of all parties involved. Post explained that without Figore's signature, he might be subject to a suit by Reid—thus Post required the signatures from all parties and intended for all parties to sign the agreement. For Post, the signature of Ms. Reid was a particularly strong incentive to enter into the agreement in the first place. (Finding of Fact ¶ 41.) Without Reid's signature, Post had a much lower incentive to enter into the agreement. Bochetto testified, "[I]t was obvious both from the context and from the spoken word at the meetings that all three people . . . had to agree to that document or it wasn't going to take effect. (Finding of Fact ¶ 42.) Figore testified, "My understanding was that Mr. Anesh was going to submit his proposal in writing and then it was contingent upon all of us agreeing to do it." (Finding of Fact ¶ 43.) This credible testimony is convincing evidence of the parties' intent surrounding the contract. Figore's testimony is particularly persuasive because he had little to no personal interest in the case. By contrast, in

*Shovel*, there was no evidence that the PLCB believed that the agreement was binding only upon the signature of all of its signatories.

*Shovel* is otherwise distinguishable. The *Shovel* court stated that the mere presence of several signature lines is not conclusive evidence that the parties only intended to be bound upon the signature of all signatories. In *Shovel*, the agreement at issue existed only between two parties: Shovel and the PLCB. The missing signatures were of two high-level employees at the PLCB. However, two other high-level persons, the PLCB Chairman and the Attorney General, had signed the contract on behalf of the PLCB. Thus, at least one representative from each party signed the contract. The signatures of two of four PLCB members adequately show an intent on the part of PLCB to be bound, assuming that all other parties to the contract signed it. The only other party, Shovel, also signed the contract and intended to bind itself. In this case, there were four separate parties to the contract, and only two parties (Anesh and Bochetto) signed the contract. The absence of signatures from two completely separate parties is a more significant omission than the absence of signatures from a party whose interests are already represented by other signatories.

Because the parties only intended that the Anesh letter form a binding contract upon the signature of all four parties, I conclude that the Anesh letter does not constitute a binding contract, and therefore its terms do not determine the amount of reimbursement due to Post by St. Paul.

2. The date that coverage begins

The next question is, when does St. Paul's duty to cover begin? Post argues that he is entitled to legal fees and expenses incurred at least from October 12, 2005, because by this point

20

Post had adequate notice of Mercy's impending malpractice claim against him. St. Paul argues that coverage did not begin until February 6, 2006, the date on which Mercy filed an Answer and thus, according to St. Paul, officially intervened in the Sanctions Petition.

Under the terms of the Liability Policy, a "claim" or "demand for damages" against a protected person is considered to have been first made on the date that St. Paul or any protected person "first receives written notice of such claim," or when St. Paul receives written notice from a protected person "of a specific wrongful act that caused the loss which resulted in such claim or suit." *See* Findings of Fact ¶¶ 4-5. Post's receipt of Mercy's written notice of its intention to sue him for malpractice triggered St. Paul's duty to defend.[6] Therefore, St. Paul had a duty to cover Post for Mercy's ***malpractice claim*** on October 12, 2005.

Under the terms of the Liability Policy, this duty to defend encompassed defense expenses, including those which stemmed from "proceedings involved in the suit." I previously held that St. Paul had a duty to defend the ***Sanctions Petition*** proceedings "after Mercy joined the sanctions petition," because this is when the sanctions proceedings became "involved" in Mercy's previously asserted malpractice claim. (*See* Doc. #86, p. 9.)

Therefore, to determine when St. Paul's duty to cover costs for the sanctions proceedings began, the crucial question is, when did Mercy "join" the Sanctions Petition, such that the sanctions proceedings became "involved" in Mercy's malpractice claim? St. Paul argues that Mercy joined the Petition when it formally filed an answer in February of 2006. I find, however,

---

[6] I previously held that Mercy's written notification of their plan to sue Post for malpractice qualified as a "demand for damages." (*See* Doc #86, p. 7.)

that Mercy became sufficiently involved in the Petition to have "joined" the proceedings from the day the Petition was filed, on November 21, 2005.

Shortly after the Sanctions Petition was filed, two counsel for Mercy participated in a conference call with Judge Olszewski. (*See* Finding of Fact ¶ 26.) Further, Mercy insisted early on in the proceedings that it receive copies of all discovery produced by Ben Post. *See* Finding of Fact ¶ 27. Mercy also appeared to be privy to Joseph Quinn's actions regarding the proceedings before Post was. *See* Finding of Fact ¶ 28. It is apparent from the facts established at trial that Mercy was involved in the Sanctions Petition from the beginning. Therefore, coverage for work related to the Sanctions Petition began when the Petition was filed, on November 21, 2005. As previously noted, any work done that related directly to Mercy's alleged malpractice claim would be covered from the point at which Post was notified of the impending claim—certainly by October 2005.

## 3. The reasonableness of the hourly rates and time expended

The next question is, at what rate(s) of attorney compensation is St. Paul obligated to reimburse Post? The parties essentially agree that Post is entitled to be reimbursed at a reasonable rate, pursuant to Pennsylvania law. The primary contention in this regard concerns what constitutes reasonable attorneys fees. Post maintains that he is entitled to be reimbursed at the rates that he actually paid the attorneys, for all work pertaining to the case, as set forth in the invoices at Trial Exhibits 93, 94, 95 and 96. St. Paul maintains that it is obligated to reimburse Post for attorneys fees at a rate of compensation based upon a prevailing market rate in the relevant community, which St. Paul contends is $285.00 per hour for partners, and $245.00 per

hour for associates.[7]   St. Paul also contends that some of the work done by Post's attorneys was excessive and therefore unreasonable.

Under Pennsylvania law, where an insurer breaches its duty to defend an insured, "[b]ased on the usual contract rule for determining damages, the recovery for breach of the covenant to defend will ordinarily be the cost of hiring substitute counsel and other costs of the defense.  This recovery may be in addition to any other obtained against the insurer." *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 322 (Pa. 1963).  An insured can be reimbursed for reasonable attorneys' fees.  *Photomedex, Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 07-0025, 2008 U.S. Dist. LEXIS 8526, at *28 (E.D. Pa. Feb. 6, 2008).  A reasonable rate is not confined to the legal rate that an insurer pays attorneys generally, or that the insurer would have paid attorneys in the particular case had it timely assumed its duty to defend.  *See id*.

The determination of what constitutes reasonable attorneys fees is at the discretion of the trial judge.  *Freeze v. Donegal Mut. Ins. Co.*, 603 A.2d 595, 602 (Pa. Super. Ct. 1992).  *Accord Lindy Bros. Bldgs. Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166 (3d. Cir. 1973).  The determination "is a fact-intensive inquiry, requiring competent evidence." *Photomedex*, 2008 U.S. Dist. LEXIS 8526 at *69.

In determining whether counsel fees are reasonable, the court should consider several factors:  the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the

---

[7] St. Paul's primary contention regarding hourly rates is that it was obligated to reimburse Post at the rates set forth in the Anesh letter.  However, because I have determined that the Anesh letter is not a binding contract, I disregard this position.

property in question; the professional skill and experience called for, and the standing of the attorney in his or her profession; the result he or she was able to obtain; the pecuniary benefit derived. *See Freeze*, 603 A.2d. at 602; *See also Huffman Estate*, 36 A.2d 640, 643 (Pa. 1944). Additionally, courts have found that the fact that a client paid its own defense costs without assurance of reimbursement is "compelling evidence" that the costs were reasonable and necessary. *See Rite Aid Corp. v. Liberty Mut. Fire Ins.*, No. 03-1801, 2006 U.S. Dist. LEXIS 57094, at *13 (W.D. Pa. Aug. 14, 2006) (internal citations omitted). Thus the determination of a reasonable hourly rate, in the context of an insurer that breaches its duty to the insured and thereafter has a duty to reimburse the insured for attorney fees incurred, is not resolved through the application of a precise rule. It is a multi-factoral inquiry.

The defense mounted for Post was responsive to a complex series of claims and proceedings against him. This was not a run-of-the-mill malpractice case. It was a knotty situation that involved various players and components. The charges against Post were serious and potentially career-ending. The tenor of the proceedings in Luzerne County exacerbated the difficulty of the case. Because of the formidable problems involved and the importance of the litigation to Post's career, Post hired experienced lawyers who could handle the situation. These lawyers, in the end, obtained a favorable result for Post.

Post has submitted pages of invoices to substantiate the fees he paid, with a detailed accounting of hours billed. Further, Mr. Abraham Reich, the Plaintiff's expert, rendered an opinion that the conduct of the lawyers hired by Post was within the range of reasonableness and was necessary for the defense of the malpractice charges against Post. Mr. Reich further opined that the rates and fees charged were within the range of reasonableness. In addition, Post paid all

of the legal bills for which he seeks reimbursement, yet another indicator of their reasonableness. Finally, as I previously stated, because St. Paul improperly failed to represent Post, St. Paul must accept the fees and the judgments of the lawyers who did represent Post.  (*See* Doc. # 154, p. 4.) Within a range of reasonableness, Post's attorneys were entitled to make their own legal and strategic decisions.  It is not the job of this court to second-guess every decision made by Post's attorneys.

The rates that Ben Post's attorneys charged and that Ben Post paid were reasonable in the context of this case.  The rates charged, which varied from $250 per hour up to $470 per hour, are within the range of reasonableness.

Further, with the exception of one billed item, and excluding for the moment work done on the separate cases of *Post v. Mercy* and *Post v. Quinn*, all attorney work performed with regard to the Sanctions Petition and malpractice claim that falls after the beginning of the coverage dates of November, 21, 2005 and October 12, 2005, respectively, was within the range of reasonableness and is reimbursable to Post.

For example, the appeal of Judge Olszewski's ruling denying Post's motion to enforce the *Bobbett* settlement agreement, and subsequent appeals in the Pennsylvania courts, were reasonable.  Post's effort to obtain relief on the issue of whether the settlement agreement prevented instigation of the sanctions proceeding was reasonable and appropriate under the circumstances.

One billed item is excludable.  The time that Bochetto spent researching insurance indemnification and claims against insurers is not reimbursable by St. Paul, as St. Paul rightly

argues and Post himself concedes. This time was not reasonably necessary to the defense of Mercy's legal malpractice claim or the Sanctions Petition, and is not reimbursable to Post.[8]

### 4. Post v. Quinn and Post v. Mercy

St. Paul argues that there is no basis for awarding attorneys' fees for legal work performed on *Post v. Quinn* and *Post v. Mercy*. *Post v. Quinn* was a defamation and tortious interference action against attorney Joseph Quinn and an ISP that was publishing an account of the *Bobbett* trial and settlement. *Post v. Mercy* involved both a draft complaint that was never filed, and a lawsuit filed against Mercy for alleged misconduct towards Post, premised on Mercy's breach of representations and promises to Post and its abuse of process in joining forces with Quinn against Post.

St. Paul asserts that the general rule is that related matters pled in the same action are generally covered, while matters that are separate from the original action are not covered. Post argues that both matters are covered because they were inextricably intertwined with Post's defense against Mercy and furthered such defense.

Both parties refer to two cases from this district as instructive. *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.* held that an insurance company is obligated to cover the costs of counterclaims filed by the insured and raised in the same lawsuit if pursuit of those claims is "inextricably intertwined" with the insured's defense and is "necessary to the defense of the litigation as a strategic matter." 766 F. Supp. 324, 334 (E.D. Pa. 1991) *(aff'd in part and rev'd in part without opinion)*. In *Safeguard Scientifics*, the insured plaintiffs, in an underlying case,

---

[8] The amount spent on these issues appears to be $26,581.

were sued for defamation and other related claims. As defendants in the underlying case, the plaintiffs filed an answer and counterclaims. The plaintiffs' insurer, defendant Liberty Mutual, refused to cover defense costs in the underlying suit. The plaintiffs sued Liberty Mutual for breach of contract. The court in *Safeguard Scientifics* found that Liberty Mutual had breached its duty to defend the insureds in the underlying action. *Id.* at 333. Additionally, the court required that Liberty Mutual reimburse the plaintiffs for the expenses they incurred in the prosecution of their counterclaims in the underlying suit. *Id.* at 334. Though the counterclaims were not compulsory, the court found they were "inextricably intertwined" with the defense of the covered defamation claim in the underlying action, and were "necessary to the defense of the litigation as a strategic matter." *Id.* This was a defense, and is distinguishable from a plaintiff voluntarily commencing suit.

In *TIG Ins. Co. v. Nobel Learning Cmtys., Inc.*, No. 01-4708, 2002 WL 1340332, at *1 (E.D. Pa. June 18, 2002), the insured, Nobel Learning Communities, Inc. ("Nobel") filed an underlying declaratory judgment action, seeking a declaration of its rights regarding certain copyrights. The defendants in the underlying action filed a counterclaim against Nobel, alleging willful copyright infringement. The insurance company, TIG, declined to cover Nobel for the counterclaim. *Id.* The two parties in the underlying action entered into settlement negotiations, which TIG again declined to cover. *Id.* The parties eventually settled. TIG then filed an action seeking a declaratory judgment that it had no duty to reimburse the insured Nobel for any sums incurred in prosecuting, defending or settling the underlying claim. *Id.* Nobel filed a counterclaim seeking declaratory judgment as to TIG's liability. *Id.* The court found that TIG had a duty to defend against the copyright infringement claim, and further that TIG had a duty to

cover prosecution of Nobel's affirmative claims after the counterclaim alleging copyright infringement was made against them. *Id.* at *15. The court concluded that the affirmative claims by Nobel were "inextricably intertwined" with the defense of the copyright infringement counterclaim. *Id.*

St. Paul also relies on *Amquip Corp. v. Admiral Ins. Co.*, No. 03-4411, 2005 WL 742457 (E.D. Pa. Mar. 31, 2005). In this case, Admiral, the insurer, refused to defend Amquip, the insured, in an underlying action filed by a third party, Maxim, against Amquip in Ohio state court. *Id.* at *1. The court in *Amquip* determined that Admiral Insurance had a duty to defend Amquip in the underlying action and that Admiral was responsible for reimbursing Amquip for litigation expenses and costs incurred. *Id.* at *7. Amquip, in addition to defending the Ohio action, filed separate lawsuits in Pennsylvania state and federal court. *Id.* at *2. Amquip sought reimbursement not only for its defense in Ohio state court, but for costs associated with the separate actions as well. Amquip suggested that these separate actions "were intended to, and did, bring pressure to bear on Maxim and its decision makers to dismiss their lawsuit against Amquip." *Id.* at 7. The court determined that these separate actions were not inextricably intertwined with the underlying Ohio state court action. *Id.* The court was concerned that including such separate actions in an insurer's duty to reimburse "would encourage and endorse multiplicity of litigation" and concluded that requiring an insurer to reimburse the insured for the cost of instituting separate actions was "much different than requiring the insurer to reimburse for the costs of prosecuting counterclaims raised in the same action." *Id.* The court distinguished *Safeguard Scientifics* and *TIG* on this basis.

I conclude that whether an action is inextricably intertwined with the underlying action is not to be solely determined by whether the claim was instituted as a counterclaim rather than a separation action. The fact that a claim is made in the context of a separate action for affirmative relief rather than as a counterclaim is not a bar to coverage when a sufficient nexus is established. Nonetheless, I consider whether a claim was filed as a separate action or in the same proceeding as one important factor that bears on whether the claim was inextricably intertwined with the underlying covered claim. Yet an absolute rule stating that a claim which is filed as a separate action is never inexplicably intertwined with the covered claim is not required by logic nor by any Third Circuit case law. The district court cases discussed above impart useful considerations. *Safeguard Scientifics* and *TIG* provide that where the claims were "necessary to the defense of the litigation as a strategic matter," *Safeguard*, 766 F. Supp. at 334, or " 'part of the same dispute' and could 'defeat or offset liability,'" *TIG*, 2002 WL 1340332 at *14, the claims are likely to be inextricably intertwined. The concern raised in *Amquip* regarding multiplicity of litigation is a valid one, but it is not present every time a party files a separate lawsuit. It is dependent upon the circumstances and the context underlying the separate action, and every case is different. I choose to look into the underlying substance of the two actions to determine whether they were inextricably intertwined with the Sanctions Petition and the malpractice claim. *See, e.g., Aerosafe Int'l Inc. v. ITT Hartford of the Midwest*, No. C-92-1532 MHP, 1993 WL 299372, at *5-6 (N.D. Cal. July 23, 1993) (The court determined that the insurer might be liable to the insured for attorney work done on a state cross-complaint and a potential federal antitrust action, refused to draw an absolute line between claims filed in the same action versus claims filed in a separate action, and stated that the key was the relatedness of the

collateral litigation and its "reasonableness . . . as part of an overall litigation strategy."); *IBP, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* 299 F. Supp. 2d 1024, 1031 (D. S.D. 2003) (holding that an insurer was required to cover as defense costs claims made in a separate proceeding).

### a. Post v. Mercy

Much of the work done drafting the *Post v. Mercy* complaint was directly related to the defense of Mercy's legal malpractice claim. The first complaint was drafted in preparation for mediation with Mercy, the purpose of which was to prevent Mercy from filing its legal malpractice claim. The fact that the draft complaint was never filed, and that the collateral lawsuit filed against Mercy was not in Luzerne County, do not change the fact that the work done drafting the complaint was done in defense of the impending legal malpractice claim. In this sense, the work done on the initial *Post v. Mercy* complaint is not collateral litigation, but part and parcel of the covered actions. As in *TIG* and *Safeguard Scientifics*, the work done was in defense of the covered claims. Certainly, the work was "part of the same dispute" as the legal malpractice claim. *See TIG*, 2002 WL 1340332 at *14.

St. Paul attempts to argue that the complaint was drafted to put pressure on Mercy, and is in contravention of the teaching in *Amquip* regarding multiplicity of litigation. There is indeed some testimony that the complaint was drafted in part to put pressure on Mercy to refrain from filing its complaint against Post. (T.T. 4, p. 84). However, the complaint alleges legitimate breach of contract and misrepresentation claims against Mercy. The existence of the insurer's duty to defend turns on whether the work done and the claims made were sufficiently related to the underlying action. Here they were—as already stated, much of the work drafting the

complaint was completed as an anticipated response to Mercy's malpractice claim. The draft complaint recounts the *Bobbett* litigation and Post's role as Mercy's defense counsel. The complaint tells Post's side of the story, and frames the factual and legal arguments that would provide a defense to any potential malpractice claim by Mercy. Thus the complaint puts at issue the lack of foundation for the malpractice claim. Moreover, many of the allegations could have been brought as counterclaims to Mercy's malpractice action in Luzerne County. It is not determinative that the case was eventually filed in Philadelphia as a separate action, rather than in Luzerne County as a counterclaim. Post and his attorneys made a strategic decision to file the claim as a separate action in Philadelphia County because of their belief that Post could not get a fair hearing in Luzerne. This was not unreasonable. In this case, the work done on *Post v. Mercy* was inextricably intertwined with the defense of the malpractice claim.[9]

   b. *Post. v. Quinn*

   The defamation and tortious interference lawsuit filed against Joseph Quinn is more problematic. Unlike the work done on the Mercy complaints, the work done on *Post v. Quinn* was not in preparation for a hearing or other proceeding directly related to the sanctions proceedings or the impending legal malpractice claim.

   As stated by Post, the suit was filed with two main goals in mind: first, to disprove as defamatory the allegations of misconduct that Mercy was relying upon in its claims against Post; second, as one additional factor to persuade Quinn and the Bobbetts to dismiss the sanctions

---

[9] As St. Paul correctly argues, the draft complaints could not have been to offset liability in the Sanctions Petition because the sanctions proceeding had already terminated before either of the draft mercy complaints were prepared.

proceeding.  (*See* Finding of Fact ¶ 44.)  While the separate lawsuit was related, "inextricably intertwined" is a higher standard to meet.  To meet the standard, the two actions should be so related that it is difficult to separate the work completed for each, or to argue that the work done on the collateral litigation was not necessary to the defense of the litigation as a whole.  The *Post v. Quinn* action, in contrast, was a separate, additional means of attempting to defend Post in the Sanctions Petition.  While not an unreasonable strategy from Post's vantage point, it went significantly above and beyond a mere defense of the Sanctions Petition and potential legal malpractice claim.  It was not necessary to the defense of the litigation.  *Post v. Quinn* was too separate and distinct from the underlying sanctions proceedings or malpractice claim to be considered inextricably intertwined with either of them.

I therefore conclude that the work done regarding *Post v. Mercy* is reimbursable to Post; however, the work done on *Post v. Quinn* is not reimbursable.

## V.  CONCLUSION

I conclude the following:

• The Anesh letter is not a contract which binds the parties in this case.

• Post is entitled to reimbursement for work done directly relating to Mercy's potential malpractice claim as of October 12, 2005, and on work done relating to the Sanctions Petition as of November 21, 2005 (the "effective dates").

• The fees that Post paid his attorneys were within the range of reasonableness. Therefore, St. Paul must reimburse Post for fees paid on all work done subsequent to the effective dates, with the exception of the $26,581 Post paid to Bochetto for

researching insurance indemnification and claims against insurers, and with the exception of work done for *Post v. Quinn*.


s/Anita B. Brody

_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: